Good afternoon. I do want to reserve two minutes. I'm Don Vowell for the plaintiffs, the appellants. So the case here, the trial court says the case is moot because TVA supposedly has suspended the new policy and reverted to the prior practices. So I would like to talk about three or four things. First, you know, what were these prior practices that they have reverted to, supposedly? Secondly, have they really reverted to them? Third, what about their explanation? That's the declaration of this forester that kind of did it. And then fourth, if time allows, I'd like to take a moment to talk about these millions of trees that the trial court ruled did not exist. So the first issue, and I don't know if this made its way to the court, but I have a little handout. It's from the record, and, you know, the TVA says the prior practices were in these guidelines that the court talked about last time. So if that's true, I thought we maybe should just take a look at it. And right here it says that leaving a 25-foot buffer zone on each side. It says that three times, and I guess that's on page one of this thing. This document came before this 15-foot rule was announced? It did. It came in, this one is from 1997. What does it say? Does it say they're going to leave the trees alone in the buffer zone? Leaving a 25-foot buffer zone on each side. Well, what does that, I mean, leaving the buffer zone, the zone itself is there, it's a zone. Does that mean leaving the trees alone? Oh, I think so, yeah. That's what the... Your argument is that the previous scheme also involved not cutting down the trees in the wire zone. Yes, I am. Not all of them. There was, you know, you could prune your trees, whether in the wire zone or buffer zone. You could prune your trees. You know, this court found that the historic practice was to maintain the buffer zone. And, of course, they would cut down trees if they posed a hazard to the lines. And also, I think you have to figure in the budgetary practice. You know, how much money were they spending? This court noted last time that, you know, the new policy was they allocated more money to the budget. And the, you know, when the new budget came in, it was going to be $159 million, I believe it was. And the budget dramatically increased. So when they... I think we're probably familiar with the evidence that you've suggested should have been considered about how the trees have been taken down. I wanted to ask a little bit about the nature of the arguments that you're making in bringing this case. Basically, you originally brought this case to seek judicial review of the decision to institute the 15-foot rule or whatever the change was. And the thrust of the judicial review was that they didn't comply with NEPA. Exactly. And if you had won on that, you would have obtained, what, some sort of invalidation of the rule, right? Or an injunction or what? An injunction that they not apply the rule until they did an environmental impact statement. So it would just be an injunction against the application of the rule, right? Exactly. And did you ever seek, like, a preliminary injunction and stays and stuff like that? We did. Where those were denied? They were denied. And you didn't appeal those? I'm just asking, I'm just trying to get the sequence of... I mean, we... I'm not complaining about that. I just want to know what's before us. We don't have that before us. We didn't seek an interlocutory appeal from that. But at the end of the day, we did appeal that in the first appeal. I understand that. I understand. So we don't have any preliminary injunctions or stays or anything like that before us. We just have the throwing out of the case on mootness grounds. Exactly. So if we were to agree with you, and I'm not saying that we would, but if we were to agree with you, then in your conception of what that means, that would mean that it would go back to the district court and the district court would then have the judicial review of the agency action before it, the end of which is, the end of which, if they ruled in your favor, would be an injunction not to follow the rule until they complied with NEPA. Is that how the, that's how it's structured? Exactly. Exactly. Or you could state it another way, that they, an injunction that they fall back to their old practices. It's, you know, the same thing. They either follow the old or don't follow the new, the same. Right. The same result. Thank you, that was helpful. Okay. Well, the second point I wanted to get to was this idea that they have, you know, have they really reverted to the prior practices? You know, as a matter of fact, you know, the trial court said they did. So. The trial court said they did? That they did. TVA, what happened? Reverted to their prior? Yes. When we were here before, TVA, you know, the court said, so where is the central decision maker, where is this prior practice? And you don't have an administrative record for the prior practice. And so we, you know, why don't we just remand this case to get the real administrative record. So when it got remanded. This is what we said? Yes. We didn't say to get the real administrative record, we said to compile an administrative record. To compile, well, yeah, that's my terminology, the real, because my contention was. Our terminology is to compile an administrative record. Yeah. And so, you know, I didn't think that they had submitted the real administrative record. They were pointing to some checklist thing. Yes. They were pointing to the checklist. And so I said, you know. That clearly was not the administrative record. Yeah. I didn't think it was. Exactly. I didn't think that was the real administrative record. And so, you know, the court said, well, we're going to remand for you to compile the administrative record for this decision. Because this is clearly not the administrative record for the decision to implement the 15-foot rule. So as soon as they got back to the trial court, they filed papers that said, look, we don't have an administrative record. We don't have any further, that's the only administrative record we had. And so we hereby suspend the 15-foot rule, or we have suspended the 15-foot rule, and we have reverted to our prior practices. You know, therefore, the case is moot and should be dismissed. I understand that. You're challenging that as not being supported by the facts. Exactly. Exactly. And to understand that, we have to know a little bit about what the previous rule was. We do. We do. And the evidence in the record is the four things that I mentioned, or what I see as the previous rule. One, keep the buffer zones, or leave the buffer zones. Two, landowners can trim or prune their own trees. Three, of course, they cut down trees that were dangerous to the lines. And four, what was the level of spending? So that's the... And two, three, and four weren't limited to the buffer zone, but include the wire zone? Correct. Is that right? That's what you argued. Let me get my numbers right. Yeah, that's true. Yeah. Is that shown in the documents that you're talking about? Yes. I think there was some confusion at some place along the line as to what exactly the previous situation was. I think there's some confusion. I don't know if it's us, or if it's the trial court, or if it's the lawyers. But one way of thinking of it is that this case is just about buffer zones. But it's not... You're contending something more than just buffer zones, right? Exactly. And I'm asking what support... Where in the record would we find that if we were inclined to agree with you? Well, the record is really scanned as to what were the prior practices. And that's why I've just pieced together those four elements of what the prior practices were. It would be... Is there a difference between policy and practice here, in terms of what was written down in the 97 and 08 documents, and what actually TVA was doing on the ground? And if there was a difference, does that make a difference for this case? There could be some differences, because what was written... I mean, this, the guidelines... What was written, and a follow-up question. Is there meaning in the area of forestry, because you're writing on a blank slate here, with this judge anyway. Does tall growing trees or low growing trees carry any special meaning in that discipline? I don't think so, and there's certainly nothing in the record about that. All right. Well, the 97 and 08 documents say that tall growing trees on the right-of-way will be cut. And that's, I think, on the same page as this. It says we're going to leave the buffer zones. I think it's the... Well, yeah, but it says tall growing trees on the right-of-way. The right-of-way includes the buffer zone, does it not? It does. Okay. So, to its fullest, the policy on tall growing trees was, if there's a tall growing tree, it will be cut. Well, the policy was that they'll, you know, leave a buffer zone also. So, if this is the... This is just what TVA has pulled out and said, oh, this is our policy. But what, you know, the practice, I think you're right, there's a difference in policy and practice, because the practice was, as this court found and as the trial court found, we leave this historic buffer zone, which is an immense number of trees. And so, we then, we find out that they have this document, which, if this is somehow justification for clearing out the buffer zone, that simply cannot be, because this is a non-public document. There's no NEPA review here. That's all, you know, I don't care what they've got written somewhere. I'm just looking as a practical. These two examples that you have investigated and found out, one is the orchard and one is the land between the lakes. Was that, do they show trees in the buffer zone or in the wire zone? Do they? Oh, those examples, at land between the lakes, to the best of my ability to figure out, it was only the buffer zones. Only the buffer zones. You mean only the buffer zones. They left trees in the wire zone and took... No, there really weren't any trees in the wire zone, as far as I know, at land between the lakes. In lots of other places there were, for example, at the orchard. You know, this is Mr. Anderson's orchard right here. All of these trees in the wire zone. That's just one example. What I understand, and I think what they're going to argue, and I'm going to ask them about it, is that they have reverted to what was the status quo ante, or the way it was before this new policy, whatever it was, came into effect. And the previous policy was one that allowed a lot of discretion. And when you have discretion, sometimes things happen that you don't like as an exercise of that discretion, but it's still consistent with the old policy. How do you respond to that? But as a... And you come in with evidence that, look, the new policy is still being applied, even though they say they've stopped it, right? Or the new, I don't know if you don't want to call it a policy procedure, whatever you call it. Practice. The new practice has continued. But if the same facts on the ground could result from the old practice and the new practice, then your evidence does not really counteract the evidence about the policy. If it does, then it does. I mean, that's what I'm asking about. But they can't really be the same, because this is the old practice. For 30 years, Mr. Anderson was allowed to prune his trees. And the court noted last time... That couldn't be that you have a new administrator or somebody who wants to be tougher or something when you have all kinds of discretion? Well, and this new guy, if you will, he didn't give a reason. He just said, I decided all the fruit trees should be cut out. The old practice, they had to give reasons to take down trees? No, but the old practice, they left them. They didn't give reasons one way or the other. But I mean, if you have a discretionary policy, it would seem like it might be consistent with a discretionary policy to do things that you haven't done before. No, certainly it could be. But if you have a reason, then if you're going to change the practice, I guess you need a reason to do that. And he didn't give one for Mr. Anderson's orchard. Does a change of practice have any implication for the requirements of the NEPA? They do, because it's a major federal action. Includes policies, practices. And here we have, my goodness, we have a humongous federal practice. These buffer zones, millions of trees. They didn't stop that. They said it. Return to their old practice, which was discretionary. Yeah, I'd like to get clear on the procedural posture of this. Would you agree that the question whether they have, in fact, suspended the 15-foot rule is a question of fact? I would. And you have sought discovery on these issues, correct? I have. And you've been denied that discovery. I was. Correct. And so you're somewhat hamstrung in your ability to spell some of these things out. But you have come forward with some affidavits that either it's a strong coincidence that all of a sudden they're leveling everything for a 31-mile stretch. Or maybe they haven't stopped doing it across the board. And so the district court, I guess, did not address your evidence concerning the Anderson property and concerning land of the lakes, right? All correct. And the district court, I mean, you moved for discovery, is that right? Yes.  It was. And if you can just remind me, what was the basis of the district court's denial of the discovery? I don't even remember what the basis was. No, he denied it after he found that it was moved, didn't he? Well, we asked for it. I think we asked for it before that decision was made. I thought it was grounds for denying it. Oh, I think he said... We had asked for it before. I think he said because you didn't renew the request or something. I think that maybe was in one of the orders. But we raised it a number of times. Okay. That helps me out and I'm going to want to confirm that with the TVA, but thank you. You're welcome. I think my time is probably up. We don't have a crowded docket this afternoon. Okay. Good afternoon and may it please the court. Regina Coho for Defendant Appellee, Tennessee Valley Authority. Judge Rogers, I wanted to start with something that you addressed about the fact that reverting back to the 2008 guidelines, it essentially reinstates a very broad discretionary policy. And you asked a question kind of getting at whether, in practice, the discretionary policy might, on certain tracks of TVA's rights of way, look somewhat like the application of the 15-foot rule. And I think that is a possibility. But what plaintiffs are trying... It's like a small one, to be candid. That it would happen that that much of a change in local policy would occur in that sequence. Well, I think that... For the reasons Judge Ketledge is suggesting. Right. Sure. If you have discretion, you can change your exercise of discretion on a tract-by-tract basis. But when you have a policy to clear it all and then that policy is stopped and then there's a fairly large-scale action that looks more consistent with the stopped policy than it looks consistent with the previous policy, it's conceivable, but it looks... It gives you pause. Right. And I understand that. How do you respond to that? It seems like the district court just ignored it. Well, I think that, first of all, to get to the point that the plaintiff's counsel is asking the panel, which is to say that these two instances demonstrate that something is being done on 15,900 miles of transmission line. You have to presume that a senior vice president from TVA, the forester in charge of this maintenance on these two tracts is engaging in bad faith, essentially. That's kind of the issue. I mean, we're not going to presume that your position is meritorious and, therefore, the case should be dismissed. I understand. May I? Please. Again, the same procedural question. This is a question of fact, correct? Correct. And would you agree that the court should resolve this as it would any other question of fact? Namely, if there is evidence that suggests an allegation is correct? I guess, let me just, aren't they entitled to discovery about whether what you're saying is true? Well, I mean, I would point out that TVA has the burden to establish mootness. So whether the plaintiffs should get a bit of discovery, maybe. Why shouldn't they have all the discovery they want on this? I mean, first of all, we're on round two, which is another subject. But they have said TVA has continued the policy. They've come forward with evidence that is certainly consistent with a continuation. I mean, Mr. Anderson gets a notice in 2014, we're going to take them all down, or whatever year it was, per the 15 foot. And then all of a sudden they show up in his backyard and take it all down. I mean, it's not only consistent with it, it looks like it's pursuant to, given the line of communication with Mr. Anderson. We have the land of the lakes, 31 miles. It's all cleared. It's mulched. 40 to 100 year old trees, sort of ipso facto, had not been taken down earlier. Now they're taken down. Why isn't that enough, notwithstanding the two affidavits, to entitle them to discovery about whether, in fact, this is happening? Well, if I could clarify a few things about the Anderson Declaration. Okay, but just make sure you answer that question about the discovery proper. Sure. If I could just clarify about Mr. Anderson. In 2014, when someone came and said, we're cutting all these down, the 15 foot rule was admittedly in place. So that's the reason for that statement. When Mr. Bulow came back, he did say he decided he was going to cut the trees in the wire zone, but the buffer zone, there were six buffer zone trees that he said could remain. I mean, if in fact the 15 foot rule... Were there only six trees, do we know, in the buffer zone period? As opposed to, I'm going to let you keep these six two inch diameter trees. I'm honestly not sure how many trees total. Don't you think we need to be more sure about all this stuff before we broom what seems to be a fairly significant matter? Well, I think that if the panel is uncertain about this, then the correct procedure would be to send it back down to the district court for further factual findings. Because I don't know that... You cannot make the finding that plaintiffs want you to make based on the record as it exists. So I wouldn't... The district court made the finding that the TVA advocated, which is that it stopped. And they're saying... Well, I'm not sure if they're saying as a matter of law it hasn't stopped or it's sort of a, so to speak, genuine issue of material fact or we're entitled to discovery. But as to my question specifically about discovery, would you agree that they are entitled to discovery, full discovery, the way you have in a civil case? Not sort of grudging discovery, but full discovery as to whether, in fact, the 15-foot rule has been suspended as TVA has represented to the courts. Well, I don't know if right off the bat full discovery would be warranted. I think that TVA should be allowed to put forward some additional evidence first. And then if whatever questions are remaining, I think Mr. Vowell could make specific requests. But... I think he's had some specific requests. Well, I would point out that the discovery that he states before this court that would be helpful for him was not what he requested in the district court. In his motion for discovery, which was Docket Entry 246, he wanted discovery to test TVA's claims that TVA thought, believed, and considered that its 2012 CEs addressed the effects of the 15-foot rule. And he specifically said that would help debunk, once you got to the attorney's fees phase, that... So are you asserting there was no request for jurisdictional discovery? Not specific to what he's arguing before this court. If we did send the case back, it would be reversing Judge Varlin's grant of your motion to dismiss. Yes. So the first thing on Judge Varlin's plate, if we sent it back, would be for the court to permit jurisdictional discovery and then basically re-litigate and re-decide, if you will, your motion to dismiss. I think that's correct, Judge Mullen. Or you could do what we sent it back for last time, which is to compile the administrative record. In all honesty, we don't have an administrative record. I know. You compile one when you don't have one. That's how things work, with respect. There is a decision, right? Was it a totally oral, mental decision, and then it popped out of some administrator's mouth all of a sudden? Or was there any paperwork? I believe it was largely a budgetary decision. Are budgetary decisions made in the back of someone's mind and pop out fully formed? Or do you have a process for coming to that decision? There is a process. And so when you're asked to compile a record, you compile a record of the process and then you look at it to see whether they complied with the procedural requirements. That's how administrative law works. You can't just say, there is no administrative record, so we refuse to compile one. I must say, when the Court of Appeals tells the agency to compile an administrative record and they just don't do it, it's not contempt, maybe, but it's getting right up to the edge. To be candid, what the court was wanting TBA to compile was the study of the effects of the use of the 15-foot rule in cutting trees, and there wasn't a study for that. I was on that panel, and what I wanted was an administrative record for the decision that we were reviewing. Is it simply the case that it would appear that TBA just simply didn't do the sort of analysis that NEPA would require before it started implementing the policy? That is correct. I forget in the first appeal, but did TBA agree in the first appeal that this action would be subject to NEPA? Yes. One thing that seriously troubles me about where we're at in having this case here again is I remember the argument last time being, well, something about the checklist. But if TBA understands that this is a major action that requires a NEPA review for its effect upon the environment, and TBA knows that it has not done such a review, why were we arguing in the first appeal about whether the checklist and so on satisfies that federal law requirement? If I could go back. I think that TBA's view of things is maybe not that it was a... I think TBA was viewing the 2012 vegetation maintenance, which was a particular portion of its right-of-way system. It was viewing it through the lens of the checklist, the CECs that it does, and it considered that that was the environmental review that it did. The case was about the 15-foot rule, which is different from the 2012 thing? Yes. I guess, I mean, I feel like I'm concerned. I'm not reaching a conclusion. I'm concerned that the TBA was not candid with this court in the first round of litigation. And so we say, come up with the administrative record, and then the TBA goes down to the district judge and says, well, actually, there isn't one. In which case, why didn't the TBA say that earlier and save the first round of litigation and allow the TBA's actions to come into compliance with the law sooner than it has? I mean, I do think that from the transmission people's perspective, they essentially viewed what they were doing as the same. They got more money, and they thought, well, we're doing what we could have done. I understand. And I know that the optics of that are not good, but I don't think that it was an effort to be disingenuous. It was. My perspective is similar but not the same as Judge Ketledge, and I don't speak for my colleagues. But it seems to me what we did was ask you to compile a record that supports or led to the decision that was being reviewed. Whatever it might be. Whatever that decision is. Whatever's in the record. If it's scrap paper or e-mails or whatever it is, that record should be compiled. And the only excuse for not compiling it is to say that the case is moot. But mootness is not just we've stopped doing. Mootness is eliminating the consequences of what we did. So even if the policy was erased at some level, if there are people on the ground who are acting like the policy is still the policy, then it's not moot because there's effects from this decision, which our job is to review. We can't review it until you give us the record to review it. And if there is no record, the Supreme Court says we can get the decision makers before the court and ask them. But the Supreme Court says don't do that until you've tried to get the record. So you try to get the record. We try to get the record. And then there's this, well, it's moot, but it's kind of questionable whether it's moot or not. Maybe your client should be compiling the administrative record until it gets a mootness decision. It would be a little bit more respectful of the process, I think. Does that make sense? And I don't think it was TVA's intent to be disrespectful of the process. You wouldn't have to have so much discovery to try to figure out what's going on if you knew what the agency was doing. The agency is supposed to proceed with regularity. They're public agencies. On behalf of the government, they've got to proceed with regularity. And we've got to be able, as a court, reviewing it to make sure it's legal. We've got to see what you did. And it shouldn't have to be hidden or subsumed and superseded and all of these, I don't know, with respect to lawyer gyrations to keep us from seeing what the basis for the decision was. That's my perspective. And I think it was a money decision, and there's not a review. No, but you think. I want to sit around. The compile a record doesn't mean see if there's a record, and if there isn't, we're done. I think that what we were saying, and perhaps what Judge Rogers is getting at in the first appeal or first decision, was not simply produce a record that is compliant with NEPA, but produce the record of your decision, period, and the courts will then determine whether it's compliant. And we haven't gotten that record, and our opinion is still there. And if this goes back, I mean, speaking for myself here, the TVA better produce that record. Produce the record in whatever, I mean, it's sort of you go back and you find the documents relevant to the decision and you present it to the district court. I think that's what we were saying last time. And it's troubling that it hasn't happened. I mean, it puts you in a tough spot because you're trying to speculate. And that could, TVA could have been erroneously viewing the order in a narrow view, since we didn't have a NEPA review. That's why oral arguments are sometimes helpful. We can convey a little bit more. Right, and I completely understand. I see that my time is up. If there are any further questions. Well, the declarations that were filed on behalf of the TVA executives, they say that you've reverted to the policy in the buffer. One of them, I think, says in the buffer. They're not clearing trees in the buffer zone, I guess. So we've reverted back to the 2008 guidelines, which have the minimal clearing standards for the buffer zones. But I would point out that it does say that that is a minimum and that if its managements wish, the full width can be recleared. So there's that. And then that also has the tall growing trees in the right-of-way, and that covers the entire right-of-way will be cut. So it's the 2008 guidelines. I believe that's document 50-1. I think that some of the documents we've seen in the second appeal suggest that the prior practice was not to basically have a 15-foot rule in the wire zone. That seems to be part of what's factually uncertain at this point, and maybe we, our court, we might have thought in the first appeal that the practice, the 15-foot rule was already being implemented. I mean, it was already the prior practice in the wire zone and that it was an extension to the buffer zone. But it seems like, based on some of the evidence here, that actually the 15-foot rule was not being applied in the wire zone either. Maybe that's part of what needs to get cleared up here. I think that directives always under the prior guidelines to landowners was don't plant anything under the wire zone. There are trees that are in the wire zone throughout. I don't know how many it's not. I don't think it's as much as plaintiff's counsel kind of extrapolates from certain areas, but there are trees that have remained in the wire zone. I think that if you look at the communications in 2012 from various TVA executives, I think the focus was on the rhetoric was we're reclaiming the full width, we're widening. So the focus, I think, was on the buffer zones, but would that have applied to trees that were taller than 15 feet or could grow in a wire zone? Yes. Okay. Okay. Those are my questions. Thank you. Thank you. Where did 15 feet come from? Mr. Regg, in his declaration, which is ECF 50, said that it was being an objective standard for trees. I think that I'm not exactly sure where the 15 feet. I think that may be something that is in various forestry guidelines and they thought it would be a clear communicator to the public. Here's something we can say to you that lets you know. It's true that tall growing trees are nowhere to find in any of the documents, right? That is true. I guess the last thing I would add is that it seems to be common ground that the 15 foot rule as originally proposed or implemented would be subject to NEPA, that the agency has not done the analysis that NEPA requires. And moreover, the agency is representing that it's not following the 15 foot rule. Now they dispute that. But given the common ground I just described, I personally really hope this case does not come back to us with any indication that the TVA is continuing to do this 15 foot rule from this point forward. I can't issue a stay or something. It's not my place. But I just hope that when it comes back to us that that is not the situation. That would be a bad situation. I completely understand, Judge Ketledge. Thank you. Thank you. Thank you. Thank you. Unless the court has questions, may I? It makes sense for you to do that. Thank you.